Jose Garcia FRAGEDELA, Lazaro Thomas Gonzalez, Julia Fernandez, Alfredo Rodriguez Estevez, Felix Barrios-Rodriguez, Eloy Periera, Jose Abad Nuñez, Luis Garcia, Jose M. Mateo Ruiz, Francisco Peña-Chaviano, Cristobal Turrent, Juan Dearmas Peña, Alejandro Madero Carvajal, Amando Pozo, Carlos Montero-Requeño, Jesus A. Rodriguez-Delgado, Roberto Fernandez, Rene Barbaro Betancourt, Lastre Humberto, Pablo Garcia, Joaquin Miranda, Rudesindo Enrique Izguierdo-Gonzalez, Pedro Dominguez, Essie Andres Perez, Oscar O. Hernandez, David Vento, Armando Del Rosario Vargas, Francisco R. Suarez, Roberto Viza-Navarro, Beraldo Diaz,

v.

Richard THORNBURGH, in his Official Capacity as Attorney General of the United States.

Civ. A. Nos. 90-1243, 90-1250, 90-1253, 90-1314, 90-1320, 90-1321, 90-1327, 90-1339, 90-1345, 90-1348, 90-1349, 90-1364, 90-1413, 90-1415, 90-1417, 90-1424, 90-1425, 90-1458, 90-1459, 90-1462, 90-1465, 90-1472, 90-1478, 90-1625, 90-1631, 90-1638, 90-1645, 90-1699, 90-1710 and 90-1793.

United States District Court,
W.D. Louisiana,
Alexandria Division.

April 12, 1991.

Carl E. Perry, Asst. U.S. Atty., Lafayette, La., for respondent.

## RULING

LITTLE, District Judge.

■ Each petitioner is a Cuban national who came to the United States in 1980 during the Mariel boatlift. The Immigration and Naturalization Service detained petitioner upon his arrival at the United States border and eventually decided to exclude him from admission into the country. 8 U.S.C. § 1226. De jure petitioner has never entered this country. De facto he is physically present and living in this country on parole.[1] 8 U.S.C. § 1101(a)(13).

Under the statutory scheme, whenever the INS renders a formal order of exclusion, it is to deport the alien to the country of his origin, or failing that, to the country of which he is a citizen, where he was born, where he has a residence, or any country willing to accept the alien. 8 U.S.C. § 1227. Unfortunately, INS has been un-able to deport petitioner because Cuba has refused to accept him. INS has granted parole status to the petitioners, enabling them to live outside of a governmental detention facility, albeit with restrictive conditions upon his movements and activities.[2] Petitioner, however, filed the petition for habeas relief while in the INS' actual physical custody.[3]

Petitioner now brings this application for writ of habeas corpus. It is difficult to discern the precise ground which he claims justifies habeas relief. Nevertheless, the court will attempt to parse through the relevant statutory and regulatory provisions as they apply to petitioner.

Generally, petitioner claims that INS possesses no authority to detain him. He asserts that INS may detain an excludable alien only for a reasonable time after it has rendered a final order of exclusion; thereafter, it must either deport the alien or release him outright. Each petitioner points to the existence of various Constitutional and statutory provisions in support of the assertion that the INS is violating his liberty interests.

As a threshold matter, the court must determine whether it possesses jurisdiction to grant habeas relief. The INS argues that because it has paroled petitioner into the country, the court no longer possesses jurisdiction to grant relief because the petitioner is not in the custody of the United States. The Fifth Circuit Court of Appeals

---

1. "Entry" occurs either when an alien crosses the territorial boundaries of the United States and is admitted by an immigration officer or when an alien actually and intentionally evades inspection at the port of entry and is free from restraint any time thereafter. *United States v. Oscar,* 496 F.2d 492, 493–94 (9th Cir.1974); *United States v. Vasilatos,* 209 F.2d 195 (3d Cir. 1954); *Edmond v. Nelson,* 575 F.Supp. 532, 535 (E.D.La.1983). Thus, an alien may be physically present within the borders of the United States and have not made a statutory entry. Such persons are considered legally detained outside the United States at the border. *Jean v. Nelson,* 727 F.2d 957, 969 (11th Cir.1984) (en banc), *aff'd* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985). Because petitioner never entered the country, he is subject to exclusion rather than deportation. *Garcia–Mir v. Smith,* 766 F.2d 1478, 1484 (11th Cir.1985). Those who have entered the country, even illegally, possess greater constitutional and statutory rights in the immigration and deportation context. *See generally Landon v. Plascencia,* 459 U.S. 21, 25–27, 103 S.Ct. 321, 325–26, 74 L.Ed.2d 21 (1982); 8 U.S.C. § 1251; Tribe, *American Constitutional Law,* § 5–16 at 358–59 (1988).

2. All Mariel Cuban parolees must be sponsored by or placed with an approved halfway house, mental health project, community project, or close relative who is a permanent resident or citizen of the United States. In addition, each detainee is subject to additional individual restrictions as circumstances warrant. 8 C.F.R. § 212.12(f).

3. Many of the petitioners have since moved out of the Western District of Louisiana. The court retains jurisdiction over these actions. *Goodman v. Keohane,* 663 F.2d 1044, 1047 (11th Cir.1981).

considered a similar contention in *United States ex rel. Marcello v. District Director of Immigration and Naturalization Service,* 634 F.2d 964 (5th Cir.1981). In *Marcello,* the INS obtained an order of deportation against Marcello, a permanent resident alien. Marcello filed a petition for habeas corpus pursuant to 8 U.S.C. § 1105a(a)(9), which permits an alien held in custody pursuant to an order of deportation to apply to the district courts for a writ of habeas corpus. The government contended that the district court did not possess subject matter jurisdiction over the petition because Marcello was not "in custody." Instead, the government argued that because Marcello was subject only to travel restrictions and reporting requirements, he was not eligible to challenge his order of deportation by habeas.

The Court of Appeal noted that Congress provided in 8 U.S.C. § 1105a that review in the Courts of Appeal constitutes the sole means to review an order of deportation. *Marcello,* 634 F.2d at 967. The court also noted that by the same statute Congress permitted aliens "held in custody pursuant to an order of deportation" to bring habeas petitions in the district courts. *Id.* The court then examined the Supreme Court's expansion of the "in custody" concept for purposes of habeas jurisdiction generally, pointing out that habeas jurisdiction may exist notwithstanding the fact that the petitioner is on parole. *See Jones v. Cunningham,* 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963). Recognizing that most aliens subject to deportation are not held in physical custody, the court stated that if it held that aliens not in actual physical custody but nevertheless subject to deportation orders may bring habeas actions, such a holding would swallow the rule that appeal to the courts of appeals constitutes the only method to obtain review of a deportation order. After reviewing the legislative history, the court stated that Congress did not consider a possibility that the two provisions would conflict. The court further stated that if it applied the modern notions of "custody" to the case, the main procedural feature of the statute—eliminating resort to the district court in order to streamline proceedings—would be eliminated. *Id.* at 970.

The court nevertheless held that Marcello was "in custody." The court stated that when Marcello filed his petition, the government had not restrained his liberty in any way; the only possible restraint was the order of deportation, and as noted above, the court held that such an order did not confer the right to institute habeas proceedings. The district court would have been obligated to grant a motion to dismiss if the government had made one at that time. Custody had subsequently attached, however, under the more liberal standards the Supreme Court has recently articulated in such cases as *Cunningham.* Marcello was under "supervised parole," obligating him to report quarterly to the INS and notify it when he left the state for longer than 48 hours. This degree of restraint met the test for custody and conferred habeas jurisdiction on the district court. *Id.* at 971.

■ The situation here is analogous. Petitioner is under significant restraints imposed as a condition of his parole. He is certainly within the modern notion of custody. Contrary to the government's contention, petitioner is not challenging the INS' earlier refusal to parole him. Instead, he challenges the detention pending deportation to Cuba that arose as a result of his exclusion order. Thus, he is outside the judicial review framework set forth in 8 U.S.C. § 1105a and is entitled to challenge allegedly unlawful restraints against his liberty by the United States by habeas corpus. 28 U.S.C. § 2241. The familiar habeas jurisdictional requirements are that the petitioner must be held in custody by the United States authorities and this custody is contrary to the dictates of an Act of Congress or in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2241. Clearly petitioner meets this jurisdictional test and thus the court will address the merits of the petition. *Diaz v. Haig,* 594 F.Supp. 1, 3 (D.Wyo. 1981).

■ Petitioner first alleges that his continued detention violates his fifth amendment right to due process of law and his sixth amendment privileges. An alien

seeking admission to the United States does not possess fifth amendment rights because the power to admit aliens into the country is a sovereign prerogative. *Landon v. Plasencia,* 459 U.S. 21, 32, 103 S.Ct. 321, 329, 74 L.Ed.2d 21 (1982). Thus, an alien seeking admission is afforded only those rights that Congress decides to extend. *United States ex rel. Knauff v. Shaughnessy,* 338 U.S. 537, 544, 70 S.Ct. 309, 313, 94 L.Ed. 317 (1950) ("Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned"). The government does not violate an excludable alien's due process rights if it continues to detain him pending his deportation, even where the government offers no reason for the alien's continued detention. *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 212, 73 S.Ct. 625, 629, 97 L.Ed. 956 (1953); *Fernandez–Roque v. Smith,* 734 F.2d 576, 579 (11th Cir.1984) ("*Fernandez–Roque I*"). Furthermore, the sixth amendment is not implicated because immigration proceedings and detention do not constitute criminal proceedings or punishment and the rights afforded to those accused of committing crimes are not invoked. *INS v. Lopez–Mendoza,* 468 U.S. 1032, 1038, 104 S.Ct. 3479, 3483, 82 L.Ed.2d 778 (1984).

Petitioner cites cases supporting his contention that excludable aliens possess constitutional rights. Those holdings are distinguishable from the present matter because those cases addressed either an alien's constitutional interests in matters extraneous to immigration or the constitutional rights of aliens who have entered the country and therefore possess a modicum of constitutional protection. *See e.g Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (children of aliens who have entered the country illegally entitled to public education under fourteenth amendment); *United States v. Henry,* 604 F.2d 908 (5th Cir.1979) (alien must be given *Miranda* warnings in criminal proceedings). As the court has noted, such cases are not applicable to petitioner.

■ Petitioner next argues that his detention violates customary international law. Of course, international law is part of the law of the United States. *The Paquete Habana,* 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900). Customary international law is analogous to common law, and is comprised of internationally recognized principles of law. Assuming without deciding that petitioner's detention violates customary international law, he is nevertheless not entitled to release. International law is applicable only when domestic law does not speak to the outcome and is not controlling when there has been a conflicting legislative, executive, or judicial act. *Paquete Habana,* 175 U.S. at 700, 20 S.Ct. at 299; *Committee of United States Citizens Living in Nicaragua v. Reagan,* 859 F.2d 929, 939 (D.C.Cir.1988); *United States v. Merkt,* 794 F.2d 950, 954 (5th Cir.1986). Here, Congress has established a scheme for dealing with the Mariel Cubans, the executive branch has promulgated rules implementing this legislation, and the courts have held that an alien may not challenge his continued detention without a hearing. Thus, the Mariel Cubans may not challenge their detention on the basis of international law. *Garcia–Mir v. Meese,* 788 F.2d 1446, 1454–55 (11th Cir.1986).

Petitioner also asserts that the INS has no authority under the Immigration and Nationality Act, 8 U.S.C. § 1101 et seq. (INA), to detain indefinitely an excludable alien. The act provides that, upon an alien's arrival at the United States border, an immigration official may temporarily detain the alien for further inquiry if he "may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land...." 8 U.S.C. § 1225(b). The case is then referred to a special inquiry officer for an evidentiary hearing. 8 U.S.C. §§ 1225(b), 1226(a). Such detained aliens are classified in two ways. First, if detained, and if either the examining immigration officer or the special inquiry officer finds the alien to be excludable under 8 U.S.C. § 1182(a)(27), (28), or (29) (generally, aliens whose presence would endanger the welfare, safety, or security of the United States), the alien "shall be temporarily excluded." 8 U.S.C. § 1225(c). The Attorney General is then

notified.[4] If he is satisfied that the alien is excludable under the above-cited sections, and if the information upon which the Attorney General bases his finding is confidential, the alien may be summarily excluded. Otherwise, a detained alien is entitled to an exclusion hearing before a special inquiry officer during which the alien may introduce evidence and examine witnesses. From an adverse decision of the special inquiry officer, the alien may appeal to the Attorney General. 8 U.S.C. § 1226(b). The only means to challenge the Attorney General's adverse decision to exclude is by application for writ of habeas corpus in the district court. 8 U.S.C. § 1105a.

Any alien that is excluded "shall be immediately deported,"[5] unless the Attorney General finds that in an individual case immediate physical transfer is not practicable or proper. 8 U.S.C. § 1227(a). As noted earlier, problems arise when there is literally no place to send the alien. Cuba has refused to admit petitioner. In 1984, Cuba agreed to accept the return of approximately 2,400 detainees. Lamentably, Cuba suspended its execution of the agreement shortly after the program began. The Government asserts that it is handling the problem of indefinite detention of the Cubans in two ways. First, it is continuing to prevail upon the Government of Cuba to accept return of all the detainees. Second, it is actively reviewing each Cuban for parole under a program instituted after disturbances at the Federal Detention Centers in Atlanta, Georgia and Oakdale, Louisiana. *See* 8 C.F.R. §§ 212.12, 212.13.[6]

■ As petitioner correctly notes, the INA does not explicitly permit the INS to detain indefinitely an excludable alien, although it does permit temporary detention as previously discussed. The prevailing jurisprudence concerning the Mariel Cubans' situation is that the INA does not authorize the government to detain indefinitely an excludable alien in lieu of deportation unless it shows that the detention remains temporary. *Amanullah v. Nelson*, 811 F.2d 1, 9 (1st Cir.1987); *Fernandez–Roque I*, 734 F.2d at 582; *Palma v. Verdeyen*, 676 F.2d 100, 104–05 (4th Cir.1982); *Rodriguez–Fernandez v. Wilkinson*, 654 F.2d 1382, 1389–90 (10th Cir.1981); *Tartabull v. Thornburgh*, 755 F.Supp. 145, 147 (E.D.La. 1990); *Gallego v. Immigration and Naturalization Service*, 663 F.Supp. 517, 527 (W.D.Wis.1987). This requirement stems from the statutory provision that the Attorney General may in his discretion determine in an individual case that immediate deportation is not practicable or proper. The test the courts have applied gauges whether this discretion was properly exercised in determining that immediate deportation is not practicable. *Palma*, 676 F.2d at 104.

■ The INS has shown that it periodically reviews for parole all detainees. It

---

**4.** The Immigration and Naturalization Service operates under the direction of the Attorney General and is part of the Justice Department. 8 U.S.C. § 1551.

**5.** Although the word "deported" is used, it is clear that the statute means that the alien shall be physically removed, rather than that the government must then institute deportation proceedings against the alien. The use of the term "deportation" in the exclusion sections "reflects none of the technical gloss accompanying its use as a word of art" in the deportation sections. *Leng May Ma v. Barber*, 357 U.S. 185, 187, 78 S.Ct. 1072, 1073, 2 L.Ed.2d 1246 (1958); *Palma v. Verdeyen*, 676 F.2d 100, 104 (4th Cir.1982).

**6.** Under this latter program, Mariel Cubans who have been detained for any reason and may not be returned to Cuba are reviewed for parole once a year. Mariel Cubans are considered for parole in accordance with the recommendations of review panels established by the Director of the Cuban Review Plan. The panels are directed to consider various criteria in making their recommendations. A favorable recommendation by such a panel is forwarded to the Associate Commissioner for Enforcement. This officer has the authority to grant parole either outright or with certain conditions. Those Cubans whose applications for parole the Associate Commissioner has denied may request parole from a special Department Panel, a member of which interviews the applicant. The panel makes a written decision as to the advisability of parole. An applicant is entitled to only one review by a Department Panel. Thus, if he applies for parole and is denied, obtains review before a Department Panel and is denied, and then is denied for parole again, he cannot obtain a second Department Panel review. Parolees are required to obtain sponsorship, however, which generally involves placement in a halfway house, or with a close relative. Paroles may also be revoked if the conditions attendant to such are violated.

has further introduced evidence that discussions between the Governments of the United States and of Cuba concerning the repatriation of the detainees are ongoing. Representatives of the two governments held talks in June 1990 concerning the execution of the 1984 agreement. The courts in three of the cases cited above (*Fernandez–Roque; Palma; Gallego*) held that the INS parole program was sufficient to demonstrate that the detention remained temporary in character. The INS instituted the Parole Review Plan in 1987, well after the Tenth Circuit's decision in *Rodriguez–Fernandez*. It provides for more frequent parole reviews and more formal procedures in obtaining parole than the policy in effect when the Tenth Circuit court decided *Rodriguez–Fernandez*. Thus, the decision is not controlling. In any event, the fact that negotiations aimed at procuring petitioner's deportation to Cuba occur at least periodically is sufficient to satisfy the statutory criteria for indefinite detention notwithstanding any deficiencies in the parole program. The court rejects this statutory challenge.

Although not briefed, petitioner asserts that he has an expectation of liberty arising from President Carter's invitation to the Cubans who amassed at the United States Embassy in Havana during 1980 to come to the United States. He further refers to his "unextinguished right to bodily freedom." As petitioner cites no authority supporting his right to habeas relief stemming from these two concerns, the court rejects them as a basis for such relief.

■ Finally, petitioner argues that he has expectations of liberty arising from the Justice Department parole policy. The parole authority granted to the Attorney General under section 1182(d)(5) is completely discretionary in the Attorney General. The Attorney General possesses the authority to parole an excludable alien into the country. Such a parole does not change a parolee's status from excludable to admitted, however, and a paroled alien remains classified as having never entered the country.

*Leng May Ma v. Barber,* 357 U.S. 185, 190, 78 S.Ct. 1072, 1075, 2 L.Ed.2d 1246 (1958); *Delgado–Carrera v. United States,* 773 F.2d 629, 632 (5th Cir.1985); *Fernandez–Roque I,* 734 F.2d at 579. Subject to the provision that such paroles may be denied only for facially legitimate and bona-fide reasons, the courts may not review the Attorney General's decision to deny a parole to an excludable alien. *Amanullah v. Nelson,* 811 F.2d 1, 10 (1st Cir.1987); *Perez–Perez v. Hanberry,* 781 F.2d 1477, 1480 (11th Cir.1986); *Pierre v. United States,* 547 F.2d 1281, 1289 (5th Cir.1977); *Tartabull,* 755 F.Supp. at 147.[7]

As mentioned previously, the fact that a parole program exists does not create any substantive rights to parole because parole is almost entirely discretionary. Respondent submitted proof showing that most of the Mariel Cubans were paroled into the country shortly after their arrival in 1980. Once it became clear, however, that many of the parolees created for themselves alarming criminal records while in Cuba and that many were committing crimes in the United States while on parole, INS revoked a substantial number of the paroles.

After the 1987 riots, the Department of Justice instituted the Parole Review Plan, as described in the margin. The plan by its express terms constitutes the manner in which the Attorney General's significant parole discretion is exercised. It creates no more of a guaranty of liberty than do the general parole provisions. The court notes that actual release after a decision to parole a detainee is conditioned on acceptance by a halfway house or a close relative. Finally, the fact that the parole may be revoked should serve as evidence that parole in this context cannot create a guaranty of freedom. With the significant constraints on an excludable alien's activities while paroled into the country, it is difficult to discern exactly how such administrative parole may create any sort of expectation of liberty. Petitioner does not cite authority that holds that it does so.

---

7. Of course, the courts may review whether the Attorney General acted in accordance with his own regulations and the parole statute. *See*

*Jean v. Nelson,* 472 U.S. 846, 857, 105 S.Ct. 2992, 2998, 86 L.Ed.2d 664 (1985); *Moret v. Karn,* 746 F.2d 989, 991 (3d Cir.1984).

The habeas application presents a case within the court's jurisdiction. The application, however, fails to present meritorious grounds for relief. Accordingly, the court DENIES petitioner's application for a writ of habeas corpus.